UNITED STATES DISTRICT COURT
DISTRICT OF UTAH

| | |
|---|---|
| ALFWEAR, INC.,<br><br>      Plaintiff,<br><br>vs.<br><br>KULKOTE, LLC; ALFA ADHESIVES,<br>INC.; and DARREN GILMORE,<br><br>      Defendants. | **MEMORANDUM DECISION<br>AND ORDER DENYING<br>DEFENDANTS' RENEWED MOTION<br>FOR JUDGMENT AS A MATTER OF<br>LAW UNDER RULE 50(b)**<br><br>Civil No. 2:19-cv-00027<br><br>Judge David Barlow |

Before the court is Defendants KulKote LLC, Alfa Adhesives, Inc., and Darren Gilmore's (collectively, "Defendants" or "KulKote") Renewed Motion for Judgment as a Matter of Law, pursuant to Rule 50(b).[1] After Plaintiff Alfwear, Inc. ("Alfwear") presented its case-in-chief at trial, Defendants moved for judgment as a matter of law ("JMOL"), pursuant to Rule 50(a).[2] After the jury entered its verdict, which found trademark infringement and unfair competition but awarded no damages, the court denied the motion for judgment as a matter of law.[3] For the reasons stated below, the court denies the Renewed Motion for Judgment as a Matter of Law.

## BACKGROUND

*The Parties*

This action stems from a trademark dispute between Alfwear, a company that sells outdoor clothing and KulKote, a company that sells liquid chemical products.[4] In the mid-1980s,

---

[1] Defs.' Renewed Mot. for J. as a Matter of L. Under Rule 50(b) ("Mot."), ECF No. 412, filed Feb. 17, 2026.
[2] *See* ECF No. 376.
[3] *Id.*
[4] Mot. 5; Pl.'s Opp'n to Mot. for J. as a Matter of L. Under Rule 50(b) ("Opp'n") 1–2, ECF No. 422, filed Mar. 19, 2026.

Kevin Boyle[5] founded Alfwear in Utah, where he had moved to ski.[6] In 1993, Kevin Boyle rebranded the company and chose "KÜHL" because the German word "kühl" literally means "cool" as in temperature and implicitly means "cool" as in style.[7] Alfwear has continuously used KÜHL since 1993 and places the mark on its extensive apparel line that includes temperature-regulating clothing for outdoor athletic activities.[8] The KÜHL mark uses white capital letters with a blue, black, and brown color scheme, and it is usually accompanied by a shield containing a snow-covered mountain peak.[9]

Alfwear sells a full line of high-performance clothing to consumers through its website, third-party retailers, and a few KÜHL-branded stores.[10] Alfwear has its own proprietary temperature-regulating fabric, called kühl*dry*, which it does not sell to third parties and uses for its products only.[11] A significant component of Alfwear's marketing is the promotion of the specialty fabrics and technologies in its clothing.[12] Alfwear does not sell shoes, mattresses, or pillows and has no trademark associated with those goods.[13]

Since the early 1990s, Darren Gilmore's company, Alfa Adhesives, has been selling industrial adhesives to foam manufacturers.[14] In 2016, Darren Gilmore founded KulKote in Utah after he developed a temperature-regulating chemical product that creates a cooling effect when applied to foams and textiles.[15] The KulKote mark has a U.S. trademark registration for use with

---

[5] Because some of the parties share a surname, the court uses the parties' full names throughout.
[6] Trial Tr. 61:13–20, 64:7–8.
[7] *Id.* Trial Tr. 73:9–12; Opp'n 2.
[8] Opp'n 2. Trial Tr. 75:4–76:11, 82:10–25, 86:5–87:5, 88:6–89:6, 216:4–15.
[9] Mot. 8–9. Trial Tr. 115:14–20; Pl. Exs. 10, 69, 73, 490, 494.
[10] Trial Tr. 75:2–4, 77:13–18, 198:23–199:12.
[11] *Id.* 105:14–106:23, 193:6–15, 224:20–22.
[12] *Id.* 219:18–19.
[13] *Id.* 187:22–188:5, 188:23–189:5, 190:3–11, 191:1–192:3, 786:2–19.
[14] *Id.* 583:16–584:12.
[15] *Id.* 585:18–24, 589:9–16, 593:7–13.

"chemicals used in the manufacture of goods, namely, phase change materials."[16] Darren Gilmore selected "KülKōte" as the name for his new company because it describes the product— a coating that cools.[17] He testified that he added an umlaut to make the name "exciting" in an otherwise "boring" chemical business and to honor his wife's Swiss background and his family's German heritage.[18] The KulKote logos were designed by Alan Morris, an independent graphic designer.[19] Darren Gilmore asked Mr. Morris to use blue to represent the product's cooling effect but otherwise left the design up to him.[20] Mr. Morris testified that he selected cyan for many of the logos because it is the cheapest blue to print.[21] The KulKote lettering is in blue, gray, or black with a blend of lowercase and capital letters.[22] When Darren Gilmore's son, Drew Gilmore, bought a Ford pickup truck, he wrapped it in cyan with the KülKōte mark and added the company's tagline "It's Cool to be KÜL."[23]

Defendants have two websites for KulKote, which are maintained by Darren and Drew Gilmore.[24] The first—kulkote-inside.com—is designed for their manufacturer clients.[25] Defendants mostly sell their product to foam fabricators and manufacturers of mattresses, furniture, and pillows, but they have also sold their product to a shoe component manufacturer

---

[16] *Id.* 614:12–22.
[17] *Id.* 605:2–5.
[18] *Id.* 607:19–608:10.
[19] *Id.* 733:4–5.
[20] *Id.* 548:6–21.
[21] *Id.* 733:23–734:10.
[22] Def. Trial Exs. ("Def. Exs.") 1008, 1014, 1016, 1017, 1023, 1028.
[23] Trial Tr. 553:13–15; Pl. Trial Ex. ("Pl. Ex.") 342.
[24] Trial Tr. 368:18–369:7, 725:9–20, 373:12–14, 374:2–4, 436:7–9, 443:19–20.
[25] *Id.* 368:18–369:7, 725:9–20; Pl. Ex. 368.

that incorporates it into shoes sold by Rocky, Johnston & Murphy, and Magnum.[26] KulKote does not sell any product directly to consumers.[27]

However, its second website—kulkote.com—is "consumer-facing" with links to "KulKote's Certified Partners" and "KulKote's Certified Products."[28] Consumers who click on the certified partner logos are taken to webpages that promote individual certified partners and their products and that contain links to the certified partner's own website.[29] The webpage also describes the certified products' performance benefits, stating that "with KulKote in your clothing, you'll be able to perform without getting too hot or too cold."[30] KulKote initially planned to use its product in a variety of industries, including clothing, but discovered that the product produces a coarse texture "like sandpaper" when applied to clothing and washes off when laundered.[31] As a result Defendants have not had any customers in the clothing industry.[32]

In addition to its websites, Defendants also use social media and branding on products to promote the performance benefits of KulKote's temperature-regulating technology to consumers.[33] KulKote has posted on its Facebook account that "KulKote certified products help manage temperature to allow you to sleep better, live better, and perform better."[34] On Instagram, KulKote has linked outdoor adventure to its brand.[35] And on Twitter, KulKote has

---

[26] *Id.* 625:23–627:4; Pl. Exs. 263, 264, 265.
[27] *Id.* 707:5–9; Mot. 7.
[28] Trial Tr. 373:12–14, 375:2–5.
[29] *Id.* 387:15–388:14, 389:1–4, 390:11–21, 421:2–5, 875:15–876:25; Pl. Exs. 263, 264, 265.
[30] Pl. Ex. 367.002.
[31] Trial Tr. 375:6–23, 603:1–5, 604:3–14, 628:2–5.
[32] *Id.* 628:2–5.
[33] *Id.* 378:20–24, 462:16–18.
[34] *Id.* 380:12–15; Pl. Ex. 359.018.
[35] *Id.* 384:8–25; Pl. Ex. 217.

invited consumers to visit its website because if you "wear clothes," then "a KulKote Certified product is for you!"[36]



Defendants also designed a hang tag for the footwear that some of KulKote's certified partners sell.[37]



*Procedural History*

On January 14, 2019, Alfwear filed this action against KulKote, asserting federal trademark infringement under 15 U.S.C. § 1114(a), federal unfair competition under 15 U.S.C.

---

[36] *Id.* 464:7–20; Pl. Ex. 260.001
[37] Trial Tr. 394:6–395:16, 712:22–24; Pl. Ex. 431.

§ 1125(a), and common law unfair competition.[38] The case went to trial from January 12 to January 16, 2026.[39]

Before trial, the court granted Defendants' motion to strike Alfwear's second amended complaint and ordered Alfwear not to raise a contributory infringement theory of liability at trial.[40] The parties then briefed whether evidence of third-party use of the KulKote trademark could be used at trial, and the court ruled that "evidence that only shows how certified partners or licensees used the Kulkote mark is not relevant to direct infringement, which is the only theory of liability in this case."[41]

The jury trial lasted five days.[42] After the close of evidence, the jury entered a verdict finding that Defendants infringed Alfwear's marks, that the infringement was willful, and that Defendants had engaged in unfair competition.[43] But the jury also found that Alfwear did not show that it was actually damaged by Defendants and awarded no damages.[44]

## STANDARD

"If the court does not grant a motion for judgment as a matter of law made under Rule 50(a), . . . the movant may file a renewed motion for judgment as a matter of law."[45] Judgment as a matter of law is "appropriate in very limited circumstances,"[46] and is to be "cautiously and sparingly granted."[47] Generally, a "district court will grant a motion for judgment as a matter of

---

[38] Compl., ECF No. 2, filed Jan. 14, 2019. Alfwear also brought a claim for dilution that was dismissed prior to trial and is not at issue here.

[39] *See* Docket Entries for ECF Nos. 369–384, filed Jan. 12–Jan. 16, 2026.

[40] *See* Docket Entry for ECF No. 311, filed Dec. 21, 2023.

[41] *See* Docket Text Order, ECF No. 367, filed Jan. 10, 2026.

[42] *See supra* note 39.

[43] *See* Jury Verdict, ECF No. 384, filed Jan. 16, 2026.

[44] *See id.*

[45] Fed. R. Civ. P. 50(b).

[46] *Symons v. Mueller Co.*, 493 F.2d 972, 976 (10th Cir. 1974).

[47] *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996).

law only if "all of the evidence in the record reveals no legally sufficient evidentiary basis for a claim under the controlling law."[48]

In resolving a renewed motion for judgment as a matter of law, a court draws "all reasonable inferences in favor of the nonmoving party"[49] and "does not make credibility determinations or weigh the evidence."[50] In other words, the court "view[s] the evidence in the light most favorable to the jury's verdict and defer[s] to its determinations on all issues of credibility of the witnesses."[51] And because "[j]udgment as a matter of law under Rule 50 is appropriate only if the evidence points but one way and is susceptible to no reasonable inferences which may support the nonmoving party's position,"[52] a movant seeking judgment as a matter of law "has a high hurdle to overcome."[53] Put differently, "[t]he quantum of evidence necessary to defeat a JMOL motion is slight."[54]

## DISCUSSION

Defendants argue they are entitled to judgment as a matter of law on the trademark infringement claim because no reasonable jury could find a likelihood of confusion or willful infringement.[55] The court addresses each argument in turn after it addresses the issue of waiver.

As a preliminary matter, Alfwear argues that numerous arguments in Defendants' Rule 50(b) motion are waived because the arguments were not raised in their Rule 50(a) motion.[56]

---

[48] *Bill Barrett Corp. v. YMC Royalty Co., LP*, 918 F.3d 760, 766 (10th Cir. 2019) (quoting *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237, 1244 (10th Cir. 2009)).
[49] *In re: Cox Enters., Inc.*, 871 F.3d 1093, 1096 (10th Cir. 2017).
[50] *Liberty Mut. Fire Ins. Co. v. Woolman*, 913 F.3d 977, 983 (10th Cir. 2019) (internal quotation marks omitted).
[51] *Lampkin v. Int'l Union*, 154 F.3d 1136, 1142 (10th Cir. 1998).
[52] *Mountain Dudes v. Split Rock Holdings, Inc.*, 946 F.3d 1122, 1129 (10th Cir. 2019) (internal quotation marks and citation omitted).
[53] *Hampton v. Dillard Dept. Stores, Inc.*, 247 F.3d 1091, 1099 (10th Cir. 2001).
[54] *Stroup v. United Airlines, Inc.*, 26 F.4th 1147, 1156 (10th Cir. 2022).
[55] Mot. 16–48. Defendants also ask the court, in the alternative, to order a new trial. *See id.* 5.
[56] *See* Opp'n 19, 24, 28, 29, 30, 31, 32 & n.15, 35, 50.

Defendants respond that because they argued in their Rule 50(a) motion that Alfwear lacked sufficient evidence to show a likelihood of confusion on each of the six factors, whether they assert "the exact same facts" in both motions is "immaterial."[57]

While it is true that courts "liberally construe Rule 50"[58] and it "does not require technical precision in stating the grounds of the motion," the rule "does require that they be stated with sufficient certainty to apprise the court and opposing counsel of the movant's position with respect to the motion."[59] Thus, "a Rule 50(b) movant can only reassert the same grounds for judgment as a matter of law that he first asserted in his pre-deliberation Rule 50(a) motion."[60] With these principles in mind, the court will address whether certain contested issues are waived as they arise in the analysis section.

## I.      Likelihood of Confusion

Defendants first argue there is no legally sufficient basis for a reasonable jury to find that Defendants' use of the KulKote marks is likely to cause consumer confusion with the Alfwear marks.[61]

"The unauthorized use of 'any reproduction, counterfeit, copy, or colorable imitation' of a registered trademark in a way that 'is likely to cause confusion' in the marketplace concerning the source of the different products constitutes trademark infringement under the Lanham Act."[62]

---

[57] Defs.' Reply Mem. in Supp. of Defs.' Renewed Mot. for J. as a Matter of L. ("Reply") 1–2, ECF No. 427, filed Apr. 17, 2026 (quoting *Perez v. El Tequila, LLC*, 847 F.3d 1247, 1255–56 (10th Cir. 2017)).

[58] *Anderson v. United Tele. Co. of Kan.*, 933 F.2d 1500, 1503 (10th Cir. 1991) (internal quotation marks and citation omitted).

[59] *United Int'l Holdings, Inc. v. Wharf Holdings Ltd.*, 210 F.3d 1207, 1229 (10th Cir. 2000) (quoting 9A Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 2533, 310 (1995)).

[60] *John Bean Techs. Corp. v. B GSE Grp., LLC*, 2023 WL 6163613, at *6 (D. Utah Sept. 21, 2023) (quoting *Mountain Dudes*, 946 F.3d at 1131 (citing *Perez*, 847 F.3d at 1255)).

[61] *Id.* 16–46.

[62] *Universal Money Ctrs., Inc. v. Am. Tel. & Tel. Co.*, 22 F.3d 1527, 1529 (10th Cir. 1994) (quoting 15 U.S.C. § 1114(1)(a)).

Thus, the "central inquiry" on a trademark infringement claim "is the likelihood of consumer confusion."[63]

> In the Tenth Circuit, likelihood of confusion rests on six nonexhaustive factors: [64]
>
> (1) the degree of similarity between the marks; (2) the intent of the alleged infringer in adopting its mark; (3) evidence of actual confusion; (4) similarity of products and manner of marketing; (5) the degree of care likely to be exercised by purchasers; and (6) the strength or weakness of the marks.

"These factors are interrelated and no one factor is dispositive."[65]

### A.    Degree of Similarity Between the Marks

Of the six factors, "the degree of similarity is the most important factor."[66] Courts measure similarity by "sight, sound, and meaning."[67] In analyzing these elements, courts "must determine whether the allegedly infringing mark will confuse the public when singly presented, rather than when presented side by side with the protected trademark."[68] In other words, a court must assess the similarities and differences of the marks "as they are encountered by consumers in the marketplace."[69] And although "the dominant portion is given greater weight, each mark still must be considered as a whole."[70]

---

[63] *Equitable Nat'l Life Ins. Co., Inc. v. AXA Equitable Life Ins. Co.*, 434 F. Supp. 3d 1227, 1239–40 (D. Utah 2020) (quoting *Beltronics USA, Inc. v. Midwest Inventory Dist., LLC*, 562 F.3d 1067, 1071 (10th Cir. 2009)).

[64] *Sally Beauty Co. v. Beautyco, Inc.*, 304 F.3d 964, 972 (10th Cir. 2002).

[65] *Id.* Alfwear asks the court to consider a seventh factor—intent to expand—because the Tenth Circuit has described the likelihood-of-confusion factors as "nonexhaustive." *See Sally Beauty*, 304 F.3d at 972. However, the Tenth Circuit has not previously recognized this factor and Alfwear provides only cursory briefing on it, with no authority cited. *See* Opp'n 48–49. Therefore, the court declines to add the factor to its analysis.

[66] *Affliction Holdings, LLC v. Utah Vap or Smoke, LLC*, 935 F.3d 1112, 1115 (10th Cir. 2019).

[67] *Sally Beauty*, 304 F.3d at 972.

[68] *Id.*

[69] *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1076 (10th Cir. 2023) (quoting *Beer Nuts, Inc. v. Clover Club Foods Co.*, 805 F.2d 920, 925 (10th Cir. 1986)).

[70] *First Sav. Bank, FSB v. First Bank Sys., Inc.*, 101 F.3d 645, 653 (10th Cir. 1996); *see also Hornady*, 746 F.3d at 1002 (explaining that "the court is not free to give dispositive weight to any one component of the marks" because "[m]arks must be considered as a whole").

 

 

 

 

Visually, the marks share a number of similarities.[71] Both use blue, black, white, and gray colors, both begin with "K-Ü," contain "L," and use a sans-serif font.[72] Alfwear emphasizes the unusual presence of the umlaut over the "U" in both marks and points to KulKote's graphic designer's testimony that he has never designed another logo with an umlaut in his forty years of

---

[71] The images come from the parties' trial exhibits. *See* Def. Exs. 1014, 1017; Pl. Exs. 10, 69, 73, 490, 494.
[72] Trial Tr. 429:23–430:6.

experience.[73] And Alfwear argues that the "dominant portion of the KülKōte mark is Kül" and that "the dominant portion of each mark" deserves more weight.[74]

In response, KulKote asserts that its mark does not have a dominant portion, but rather "the mark is a single word with two components, the totality of which represents KulKote's product."[75] Although "Kül" is the contested portion of KulKote's mark, it does not necessarily follow that it is also the dominant portion. Generally, a dominant portion of a mark represents the unique word alongside words that are merely descriptive of the product.[76] Even assuming that "Kül'" was dominant—given that umlauts are rare in the English language—and thereby deserved greater weight, the umlaut does not end the inquiry. A court cannot "bas[e] its comparison on only the components" of the marks but must "consider the marks as a whole as they are encountered by consumers in the marketplace."[77]

Viewed as a whole, there are a number of visual differences between the marks. "KülKōte" has seven letters and "KÜHL" has only four; "KülKōte" contains only two capital letters and is in blue, gray, or black lettering whereas the lettering of "KÜHL" is all in capitals and typically is in white.[78] And beyond the words themselves, "KÜHL" is often displayed next to a shield logo containing a snow-covered mountain peak whereas KulKote's mark does not appear with a shield or a mountain.[79] When comparing the marks, "the court is not free to focus

---

[73] *Id.* (citing to Trial Tr. 547:25–548:4).

[74] Opp'n 18–19.

[75] Defs.' Reply Mem. in Supp. of Defs.' Renewed Mot. for J. as a Matter of L. ("Reply"), ECF No. 427, filed Apr. 17, 2026.

[76] *See, e.g.*, *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565 (Fed. Cir. 1983) (concluding that "GIANT" is the dominant portion in "GIANT HAMBURGERS" and "GIANT FOOD, SUPER GIANT"); *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 317–18 (5th Cir. 1981) (concluding that "Sun" is the dominant portion in "Sun Banks" and "Sun Federal").

[77] *Water Pik, Inc. v. Med-Systems, Inc.*, 726 F.3d 1136, 1155–56 (10th Cir. 2013).

[78] Pl. Exs. 10, 69, 73, 490, 494; Def. Exs. 1014, 1017.

[79] Pl. Exs. 6, 10, 19, 69, 73, 75, 139, 173, 192, 198, 199, 314, 324, 325, 368, 447; Def. Exs. 1008, 1014, 1016, 1017,

solely on name similarity" and "must consider the effect of marketplace presentation, including lettering styles, logos and coloring schemes."[80] While notable visual differences can diminish the likelihood of confusion based on other similarities of the marks,[81] courts must "give the similarities of the marks more weight than the differences."[82]

As to sound, the marks' initial portions sound identical, like the English word "cool."[83] And the initial portion is, of course, what a consumer would first see, hear, or speak. Yet as a whole, the marks have different cadences that make them somewhat dissimilar to the ear.[84] KulKote's mark has multiple syllables and contains hard consonant sounds at the beginning and end of "Kōte," unlike "KÜHL."[85]

As for meaning, the marks are similar. Alfwear and Kulkote both chose the word, or variation of, "kühl" for their marks because it means cool temperature in German, but Kevin Boyle also testified that the word has a "double meaning" in America where it also connotes style.[86] Both marks seem to rely on this meaning, given Kevin Boyle's testimony to that effect and KulKote's tag line, "It's Cool to be KÜL."[87]

---

1023, 1028.

[80] *Hornady Mfg. Co., Inc. v. Doubletap, Inc.*, 746 F.3d 995, 1002 (10th Cir. 2014) (citations and internal quotation marks omitted).

[81] *See, e.g.*, *Heartsprings, Inc. v. Heartspring, Inc.*, 143 F.3d 550, 554 (10th Cir. 1998) ("Even if trade names are similar, the likelihood of confusion is reduced if the two trademarks, taken as a whole, are visually distinct.")

[82] *Affliction Holdings,* 935 F.3d at 1115 (quoting *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1090 (10th Cir. 1999)).

[83] Trial Tr. 430:9–10, 565:20.

[84] Alfwear argues that KulKote waived this argument because it did not specifically mention cadence or hard and soft sounds in the marks' pronunciation during its Rule 50(a) motion. Opp'n 19. However, KulKote did address audible differences in terms of syllables in its Rule 50(a) motion. Trial Tr. 566:4–5. The court views this argument as the type of "technical precision" the Tenth Circuit discourages and, instead, "liberally construe[s]" this argument as sufficient under Rule 50 because "the trial court was aware of the movant's position." *See Beck's Office Furniture & Supplies, Inc. v. Haworth, Inc.*, 94 F.3d 655, 1996 WL 466673, at *3 (10th Cir. 1996).

[85] Mot. 20.

[86] Trial Tr. 72:14–73:15.

[87] *Id.* 553:13–15; Pl. Ex. 342.

In sum, the Alfwear and KulKote marks share both significant similarities and significant differences. Ultimately, the question before the court is not how it weighs the evidence. Instead, the court must view the evidence in the light most favorable to Alfwear, including reasonable inferences from the evidence. The evidence here is mixed, and while it may favor Defendants, the court cannot say that the evidence points but one way and that no reasonable jury could conclude that the similarities outweighed the differences. Therefore, this factor somewhat favors Alfwear.

### B.      Intent of the Alleged Infringer in Adopting Its Mark

Under the next factor, the court considers whether KulKote "had the intent to derive benefit from the reputation or goodwill" of Alfwear.[88] "When a defendant intentionally uses the trademark of another it is presumed he did so in order to cause confusion between his products and those of the one holding the trademark."[89] But "mere knowledge [of a similar mark] should not foreclose further inquiry."[90]

At trial, the jury heard Darren Gilmore claim that he did not know of Alfwear or its KÜHL mark until this lawsuit was filed.[91] But the jury also heard significant testimony undermining Mr. Gilmore's claim of ignorance. First, the jury heard deposition testimony in which Mr. Gilmore said that while he did not remember what kind of KÜHL products he owned, he was "sure I've had a pair of pants."[92] Second, the jury heard that Darren Gilmore moved to Park City in 2013, where there is a "KÜHL"-branded store on Main Street that he has driven

---

[88] *Delta Western Grp., LLC v. Ruth U. Fertel, Inc.*, No. 2:00-cv-0045C, 2000 WL 33710852, at *6 (D. Utah Sept. 28, 2000) (quoting *Jordache Enters., Inc. v. Hogg Wyld, Ltd.*, 828 F.2d 1482, 1485 (10th Cir. 1987)).
[89] *Marker Int'l v. deBruler*, 635 F. Supp. 986, 999 (D. Utah 1986), *aff'd*, 844 F.2d 763 (10th Cir. 1988).
[90] *Elevate Fed. Credit Union*, 67 F.4th at 1080.
[91] Trial Tr. 618:1–10.
[92] *Id.* 424:12-16.

by.[93] When asked if he was aware of the KÜHL store, he answered "[o]f course." And third, they heard that Alfwear had a "KÜHL"-branded store at Snowbird ski resort from 2003 to 2009, a place where Darren Gilmore has regularly skied since the 1980s.[94] The jury also heard that Alfwear sponsored the Tour of Utah cycling event from 2013 to 2020, that Darren Gilmore is an avid cyclist, and that Drew Gilmore had seen the KÜHL marks at a Tour of Utah.[95]

KulKote contends that this is insufficient evidence of KulKote's intent because it is circumstantial and merely shows that Darren Gilmore may have had knowledge of the "KÜHL" brand.[96] The argument that the evidence was merely circumstantial is a non-starter: "There is no difference between the weight to be given to either direct or circumstantial evidence."[97] However, it is also true that in the Tenth Circuit, knowledge alone of another mark is insufficient to establish intent to benefit from another's reputation.[98]

KulKote presented evidence of Darren Gilmore's "innocuous" process by which he chose the KulKote name.[99] As described earlier, the jury heard Darren Gilmore testify that he was unaware of KÜHL prior to this lawsuit and that he had chosen "KülKōte" for the name of his chemical product because it was a "unique" and "exciting."[100] He testified that the term was appropriate because his chemical product is a coating that produces a cooling effect.[101] And he testified about wanting to use the umlaut to honor his wife's Swiss background and his family's

---

[93] *Id.* 424:20–23, 425:18–426:5.
[94] *Id.* 124:20–21, 124:19–125:7, 425:4–11.
[95] *Id.* 127:1–10, 407:9–10, 457:10–25, 864:22–25.
[96] Mot. 22–24.
[97] ECF No. 381 at Instr. No. 6.
[98] *Hornady*, 746 F.3d at 1004 ("Whether [the defendant's] founder was aware of [the plaintiff] and its products is irrelevant to whether [the defendant] adopted its mark intending to copy the [plaintiff's] mark.").
[99] *See Water Pik*, 726 F.3d at 1159.
[100] Trial Tr. 605:7–12, 607:19–608:10, 618:1–10.
[101] *Id.* 605:2–6.

German heritage.[102] The jury also learned that he obtained a federal trademark for "KülKōte," which implies that the "name arose not from an intent to confuse . . . but from 'a thorough process . . . to create a trademark.'"[103] Furthermore, Darren Gilmore testified that he wanted to use blue to represent a cold temperature, and the graphic designer who created the KulKote logo testified that he chose cyan because it is the cheapest shade of blue to print.[104] But the jury was not required to credit any of Mr. Gilmore's testimony: it was free to believe all, some, or none of it. And if the jury did not find Mr. Gilmore's statement that he was unaware of Alfwear and the KÜHL mark prior to this lawsuit credible, it would be within its rights to be skeptical of other testimony from him too.

The jury also heard other potentially contradictory testimony from the Gilmores regarding KulKote's relationship and intentions with the clothing industry. For instance, Darren Gilmore testified that KulKote has never had customers in the clothing industry and does not intend to expand into it.[105] But he also testified that "it would be great if we partnered with somebody like KÜHL to be able to develop a product."[106] And Drew Gilmore attempted to brush off the fact KulKote listed clothing as an industry on its website, claiming they were just "trying to cast this big net" of customers.[107] Yet when asked why KulKote's website still mentions clothes along with shoes, Drew Gilmore testified it was "[b]ecause we would love to be in those, selling to that industry."[108] And the jury was shown KulKote website and social media postings

---

[102] *Id.* 607:19–608:10.
[103] *Water Pik*, 726 F.3d at 1159; Trial Tr. 614:12–22.
[104] Trial Tr. 548:6–21, 733:23–734:10.
[105] *Id.* 644:24–645:7.
[106] *Id.* 400:1–5.
[107] *Id.* 375:6–17.
[108] *Id.* 446:1–4.

suggesting KulKote already was being used in clothing: for example, KulKote's consumer website showing people running accompanied by the statement "with KulKote in your clothing, you'll be able to perform without getting too hot or too cold."[109] Thus, the jury's credibility determinations could have been affected by this contradictory testimony about KulKote's intentions regarding whether it was already in or would enter the clothing industry.

Alfwear also presented evidence of similarities in marketing from which a jury could reasonably infer that KulKote chose its mark to benefit from the goodwill associated with the KÜHL mark. Specifically, the jury saw KulKote's use of marketing vehicles, mountain imagery, and outdoor enthusiasts, similar to KÜHL's advertising.[110] And Alfwear showed that KulKote, like Alfwear, has promoted its brand through cyclists, promotional clothing, and social media.[111]



---

[109] Pl. Ex. 367.002.
[110] The following sets of images are from Plaintiff's trial exhibits. *See* Opp'n 40–41.
[111] Trial Tr. 575:6–9, 576:7–10, 953:5–955:4.



PLAINTIFF'S EXHIBIT 494.001

PLAINTIFF'S EXHIBIT 217



PLAINTIFF'S EXHIBIT 7.022

PLAINTIFF'S EXHIBIT 261

PLAINTIFF'S EXHIBIT 199.019

PLAINTIFF'S EXHIBIT 32.002

This evidence conflicts with KulKote's overarching theme throughout trial that KulKote is "in the chemical business" and simply sells "a chemical product" that must be sold "face-to-face" to manufacturers, particularly in the bedding industry.[112] Darren Gilmore testified to that effect and insisted that KulKote's customers are manufacturers, not consumers.[113] The jury could

---

[112] Trial Tr. 585:18–19, 607:21, 625:1–2, 6–18.
[113] Trial Tr. 625:22–626:4.

reasonably infer, however, that such testimony does not square with the evidence presented of KulKote's consumer-oriented marketing.

KulKote insists its process of selecting its mark was innocuous, but "it remained within the jury's role as the factfinder to decide that [KulKote's] witnesses were not credible and therefore reject their testimony."[114] The remaining evidence, together with reasonable inferences, was legally sufficient to infer intent from KulKote's knowledge of the KÜHL mark because it could be found to show that Darren Gilmore had knowledge of the KÜHL mark and that KulKote's marketing resembled KÜHL's.

In sum, this factor ultimately rests in large measure on the credibility determinations made by the jury that the court declines to disturb. Accordingly, the factor favors Alfwear.

### C.      Evidence of Actual Confusion

"Evidence of actual confusion in the marketplace is often considered the best evidence of a likelihood of confusion."[115] Actual confusion is generally introduced through consumer surveys and direct, anecdotal evidence.[116] Here, Alfwear offered both types of evidence at trial.

#### 1.      Survey Evidence

In the Tenth Circuit, a survey's "evidentiary value depends on the methodology and questions asked."[117] Alfwear's expert, Dr. Michael J. Barone, testified about the survey he conducted "to see whether or not consumers would confuse men's golf shoes that reference the

---

[114] *Weese v. Schukman*, 98 F.3d 542, 547 (10th Cir. 1996). *See also Wilczynski v. Loyal Source Gov't Servs.*, No. 18-cv-2973, 2021 WL 2650380, at *3 (D. Colo. June 28, 2021) ("Plaintiff . . . appears to believe that if her testimony was 'uncontradicted,' then the jury must accept it as true.' Of course, this is not the law.") (internal citation omitted).
[115] *Hornady*, 746 F.3d at 1004.
[116] *See id.*
[117] *Water Pik*, 726 F.3d at 1144 (citation omitted).

Kulkote mark with apparel sold under the KÜHL mark."[118] At its outset, participants saw the KÜHL webpage, with its mark clearly shown, and were told they would be referred to the website later.[119] The survey then showed three different images of men's golf shoes from companies that sell golf shoes and a final image of a Johnston & Murphy golf shoe that had a reference to either KülKōte (the "test mark") or KoolKōte (the "control mark").[120]



Dr. Barone modified each image of the golf shoes from how they appeared on the respective company's website to ensure that the test mark did not draw undue attention.[121] As each image appeared, participants were asked whether they believed the golf shoe shown came from, or was affiliated or connected with KÜHL.[122] The survey showed a net confusion level of 21.7%, meaning the percentage of respondents who "would confuse men's golf shoes that reference the Kulkote mark with the apparel sold under the KÜHL mark after accounting for any

---

[118] Trial Tr. 314:16–21, 315:16–22.
[119] *Id.* 317:2–14, 320:16–321:2.
[120] *Id.* 323:11–325:12, 335:7–12.
[121] *Id.* 335:7–25.
[122] *Id.* 323:22–324:2, 325:1–6.

guessing or survey error."[123] Dr. Barone opined that this rate shows a likelihood of actual confusion.[124]

KulKote contends that Alfwear's survey evidence is legally deficient because it used suggestive questions, failed to compare the marks as used in the marketplace, and produced results that do not reflect confusion concerning the marks as a whole as encountered in the marketplace.[125] When it moved for a directed verdict at trial, KulKote did not make the first two of these three arguments, and the third was made only in reply.[126] Instead, KulKote's argument regarding Dr. Barone's testimony was that he "used Kulkote's mark and image from a website that is completely inaccessible by consumers."[127] As explained above, the court considers the JMOL standard liberally, not narrowly, and "technical precision" is not required.[128] However, much of KulKote's argument here simply was not made on directed verdict.[129] The court finds that the arguments not made have been waived. Nevertheless, for the sake of completeness, the court considers each argument in turn.

### a.     Suggestiveness of Questioning

First, the survey's questioning did not rise to the level of suggestiveness that would make it legally insufficient.[130] "By suggesting the possibility that [one brand] might be connected with another brand," a survey risk[s] sowing confusion between [the two brands] when none would

---

[123] *Id.* 329:15–19.
[124] *Id.* 330:13–23. The following image is from Pl. Ex. 221. *See* Opp'n 31.
[125] Mot. 27–32.
[126] *See* Trial Tr. 565–72, 578–80.
[127] The court further notes that KulKote's argument that its consumer website was not, in fact, accessible to consumers was based on testimony from Drew Gilmore, which the jury was free to accept or reject. *See infra* p. 22.
[128] *Anderson*, 933 F.2d at 1503.
[129] Trial Tr. 566-572; 578-580.
[130] *See, e.g.*, *Alfwear, Inc. v. Mast-Jaegermeister US, Inc.*, No. 21-4029, 2023 WL 5765891, at *10 (10th Cir. 2023); *Hornady*, 746 F.3d at 1006; *Water Pik*, 726 F.3d at 1148.

have arisen otherwise."[131] In other words, "[a] survey question that begs its answer by suggesting a link between the plaintiff and defendant cannot be a true indicator of the likelihood of consumer confusion."[132] Although the survey here asked participants whether the Johnston & Murphy golf shoe—shown with the KülKōte mark at the top of the image—was associated with KÜHL, it asked the confusion question after each of the four golf-shoe images to avoid unfairly creating a connection between Alfwear and KulKote that otherwise would not have been made in the participants' minds.[133] Furthermore, the survey did not show participants side-by-side comparisons, which the Tenth Circuit has found problematic, when asking the confusion question.[134] Thus, a reasonable jury could conclude that the question was methodologically proper rather than unfairly suggestive.

### b.    Replication of the Marketplace

Likewise, a reasonable jury could conclude that the survey asked participants to compare the marks as they would be encountered in the marketplace. "[T]he closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."[135] KulKote asserts two ways the survey fails to mirror the marketplace. First, Dr. Barone altered the images from how they appeared on their respective webpages or from how consumers would encounter them in the marketplace.[136] Although

---

[131] *Hornady*, 746 F.3d at 1006.
[132] *Water Pik*, 726 F.3d at 1147 (quoting *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 488 (5th Cir. 2004)).
[133] *Id.* at 1147–48.
[134] Trial Tr. 325:1–25. *See, e.g.*, *King of the Mountain Sports*, 185 F.3d at 1090; *Water Pik*, 726 F.3d at 1146–47; *Universal Money Ctrs.*, 22 F.3d at 1531.
[135] *Water Pik*, 726 F.3d at 1146 (quoting 5 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 32:163, at 32–357 (5th ed.)).
[136] Trial Tr. 335:7–9.

Dr. Barone modified the images of the golf shoes to ensure that the test mark did not draw undue attention, his actions could still be found to reduce the survey's ability to replicate how consumers would encounter the marks in the marketplace and thereby weaken the survey's evidentiary value. But that did not require the jury to ignore it.

Second, KulKote argues the survey failed to show the marks as encountered in the marketplace because it focused on golf shoes yet KulKote does not sell golf shoes, nor can consumers purchase golf shoes directly from KulKote's website.[137] However, the jury saw that the webpage from which Dr. Barone took the Johnston & Murphy golf shoe image came from KulKote's consumer website—kulkote.com—and contained language directed at consumers as well as a Kulkote link to Johnston & Murphy's website.[138] In response, KulKote disputed the accessibility of that webpage. KulKote presented testimony from Drew Gilmore that he created the webpage at the request of Cosmo, one of KulKote's clients, as a training aid for its client, Johnston & Murphy.[139] He also testified that the page could not be accessed through kulkote.com or an internet search and that it has been accessed "less than four times" in total.[140] Alfwear, however, produced the webpage and presented testimony that the webpage had been accessed by Alfwear, who produced it during litigation.[141] Because juries are "free to disregard or doubt the credibility of" witnesses,[142] they could reasonably conclude that the webpage—with its language

---

[137] *Id.* 331:19–20; 335:4–6.

[138] *Id.* 373:12–14, 391:9–11; Pl. Ex. 221.

[139] *Id.* 465:10–19.

[140] *Id.* 465:18–466:23, 467:2–4.

[141] *Id.* 177:10–19, 284:15–25, 329:4–14, 468:19–469:2; Pl. Ex. 221.

[142] Opp'n 15 (citing *U.S. v. Johnson*, 495 F.2d 242, 244 (10th Cir. 1974) ("The case was submitted on Johnson's uncontradicted testimony . . . but, by its verdict, the jury obviously chose to disbelieve him, as it was entitled to do.")).

and link designed to lead consumers to purchase KulKote-affiliated golf shoes—spoke for itself, as did the fact that Alfwear and its expert accessed it.

In sum, a jury could reasonably conclude that the survey evaluated the marks as encountered in the marketplace.

### c.      Confusion in the Marketplace

Finally, the survey's results reflect confusion concerning the marks, but not necessarily as encountered in the marketplace. KulKote argues that because the survey tested only the "K-Ü" letters in the marks, the confusion rate applies only to the K-Ü.[143] However, the survey followed the Tenth Circuit's instruction that a survey's control mark should "share as many characteristics with the contested mark as possible, with the key exception of the characteristic whose influence is being assessed."[144] Thus, the survey found that the participants were likely confused as to the mark, but not necessarily to the mark as encountered in the marketplace.

Weaknesses in the survey could, of course, be argued by Kulkote and considered by the jury. But the jury was still free to give the survey weight. In sum, the evidence presented to the jury on the survey evidence could lead a reasonable jury to conclude that the survey shows actual confusion.

---

[143] Mot. 31; Reply 13. This argument was not initially made in KulKote's initial directed verdict argument, but was raised for the first time on reply. *Compare* Trial Tr. 565-572 *with* Trial Tr. 578-580.
[144] *Water Pik*, 726 F.3d at 1148 (citation and internal quotation marks omitted).

### 2.    Direct, Anecdotal Evidence

As to anecdotal evidence, "isolated instances of actual confusion may be de minimis."[145] This seems especially true if there is a lack of similarity between the competing marks.[146] Here, the anecdotal evidence of actual confusion presented to the jury was minimal because of the type and number of individuals involved. Alfwear's "proffered evidence does not indicate confusion among *consumers*, only random acquaintances, and therefore is de minimis."[147] Alfwear presented testimony that "three or four people" approached Kevin Boyle to ask whether Drew Gilmore's truck with the KülKōte mark on it was Alfwear's, and that Alfwear was inadvertently "tagged in a couple of" KulKote's social media posts.[148] Because none of these instances were shown to involve actual consumers of KulKote or KÜHL, but may have been "only random acquaintances," they amount to "de minimis" evidence of a likelihood of confusion.[149] Moreover, under Tenth Circuit precedent, so few instances of confusion likely fail to establish actual confusion.[150]

Viewed as a whole, this factor favors Alfwear since a reasonable jury could conclude that the survey evidence shows actual confusion even though the anecdotal evidence does not.

---

[145] *Universal Money Ctrs.*, 22 F.3d at 1535 (cleaned up); *see also Water Pik*, 726 F.3d at 1150 ("We have consistently recognized, however, that isolated, anecdotal instances of actual confusion may be *de minimis* and may be disregarded in the confusion analysis.").

[146] *See, e.g.*, *King of the Mountain Sports, Inc. v. Chrysler Corp.*, 185 F.3d 1084, 1092–93 (10th Cir. 1999); *Universal Money Ctrs.*, 22 F.3d at 1535–36.

[147] *Heartsprings*, 143 F.3d at 557. Alfwear counters that the confused individuals could have been potential customers and KulKote failed to show that they were not. However, this argument fails because it impermissibly places the burden on KulKote.

[148] Trial Tr. 143:7–20, 273:17–247:17, 297:18–298:15.

[149] *Heartspring.*, 143 F.3d at 557.

[150] *See, e.g.*, *Hornady*, 746 F.3d at 1005 (holding that "a handful of instances over the ten years in which [defendant] was in the market constitute de minimis evidence of a likelihood of confusion"); *King of the Mountain*, 185 F.3d at 1092–93 (holding that seven episodes of actual confusion was de minimis); *Universal Money Ctrs.*, 22 F.3d at 1535 (holding that three affidavits alleging confusion as de minimis of actual confusion).

### D.        Similarity of Products and Manner of Marketing

"The greater the similarity between the products, the greater the likelihood of confusion."[151] Under this factor, courts "separately consider (1) the similarity of products and (2) the similarity in the manner of marketing the products."[152] The question is "not whether the goods and services can be distinguished from each other in some aspect, but instead it is whether consumers would believe that one entity produced both."[153] And "the greater the degree of overlap in the marketing approaches of the two entities, the greater the likelihood of confusion."[154]

### 1.        Similarity of Products

KulKote argues there is no overlap in the parties' products because Alfwear is an outdoor clothing company and KulKote sells a temperature-regulating chemical product primarily applied to foam.[155] Although clothing and chemicals are disparate products, the jury was presented with extensive evidence of how both parties have developed temperature-regulating technologies used in consumer products.[156] In other words, Alfwear and KulKote both participate in ingredient marketing where a consumer purchases a product because of the advertised ingredient—such as Gore-Tex in rain jackets or hiking shoes—and associates the advertised ingredient with the product.[157]

---

[151] *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1081 (10th Cir. 2023) (quoting *Sally Beauty*, 304 F.3d at 974).
[152] *See id.*
[153] *Instructure, Inc. v. Canvas Techs., Inc.*, No. 2:21-cv-00454, 2022 WL 43829, at *12 (D. Utah Jan. 5, 2022) (citation and quotation marks omitted).
[154] *Heartsprings*, 143 F.3d at 556.
[155] Mot. 32–36. *See also* Trial Tr. 74:24–76:1, 80:4–8, 153:7–8, 585:20–24, 601:15–17, 601:21–24.
[156] Trial Tr. 75:4–21, 86:4–87:15, 104:14–16, 105:3–19.
[157] *Id.* 90:22–91:20, 93:2–24.

For example, the jury heard how Alfwear developed a technical fabric called "kühl*dry*" for its outdoor clothing to enhance performance by regulating temperature.[158]



And they heard how KulKote likewise promotes not just its temperature-regulating technology, but also the products containing its technology—from pillows and mattresses to golf shoes and tactical boots.[159] As noted earlier, the jury also was shown KulKote website and social media postings suggesting KulKote already was being used in clothing, including KulKote's consumer website showing people in athletic wear accompanied by the statement: "with KulKote in your clothing, you'll be able to perform without getting too hot or too cold."[160] That the KulKote website's statement apparently was untrue[161] does not mean the jury could not consider what Kulkote said about how its product was or could be used.

In response, Defendants argue that ingredient marketing does not make the parties' goods more related, particularly because KulKote does not sell clothing nor can its product be applied to clothing.[162] But this belies the weight of the evidence offered at trial regarding how the parties' products both involve temperature-regulating technologies, how footwear and clothing are related consumer products, and how consumers tend to confuse ingredients with end-

---

[158] *Id.* 75:4–16, 86:5–87:8, 105:14–106:23, 216:24–217:11.
[159] *Id.* 179:7–10, 228:5–13, 317:21–318:25, 380:7–9. The following images are from Plaintiff's trial exhibits; *see* Opp'n 37.
[160] Pl. Ex. 367.002.
[161] Trial Tr. 603:24–604:14.
[162] Mot. 34–36; Reply 14–15.

consumer products that have similar marks. Based on the evidence, the jury could reasonably conclude that "consumers would believe that one entity produced both."[163]

### 2.    Manner of Marketing

Next, Defendants argue that their manner of marketing is distinctly different because this inquiry hinges on "whether the parties are competitors in the same markets."[164] For support, Defendants point to testimony from Kevin Boyle and Alfwear's CEO that Alfwear does not consider non-apparel companies to be competitors and from Alfwear's 30(b)(6) witness that Alfwear and KulKote are not competitors.[165] Darren Gilmore also testified that they "only market towards manufacturers."[166]

However, a reasonable jury could conclude that the weight of the evidence suggests otherwise. As discussed earlier, the jury was presented with evidence of KulKote's marketing that resembles KÜHL's.[167] Both parties used marketing motor vehicles, promoted their products with images of people exercising outdoors, and posted mountain imagery on their social media accounts.[168] The evidence also showed that both parties have promoted their brands in the cycling community and with promotional clothing.[169]

After considering this competing evidence, a reasonable jury could conclude that KulKote's marketing weighed in favor of confusion with Alfwear. At this stage, "the mere existence of contrary evidence does not itself undermine the jury's findings so long as sufficient

---

[163] *Instructure, Inc.*, 2022 WL 43829, at *12 (citation and quotation marks omitted).
[164] *Elevate Fed. Credit Union*, 67 F.4th at 1081; *see Sally Beauty*, 304 F.3d at 974.
[165] Trial Tr. 194:11–13, 787:9–15, 263:24–264:3).
[166] *Id.* 861:6–9.
[167] *See supra* section I.B.
[168] *See id*; Opp'n 40–41.
[169] Trial Tr. 131:16–21, 136:6–14, 132:23–25, 206:11–19, 212:18–213:3, 407:4–408:13, 409:9–410:8, 410:19–21.

other evidence supports the findings."[170] Thus, the jury had a legally sufficient basis from which it could infer that the similarity of products and manner of marketing weigh in favor of confusion.

### E.   Degree of Care Likely to be Exercised by Consumers

In contrast, there was insufficient evidence at trial to support likelihood of confusion under the degree-of-care factor. "The greater the value of an article, the more careful the typical consumer can be expected to be."[171] Accordingly, "[a] consumer exercising a high degree of care in selecting a product reduces the likelihood of confusing similar trade names."[172]

At trial, the evidence supplied by Alfwear suggested that Alfwear's consumers are likely to select to exercise a high degree of care when purchasing its products. Kevin Boyle testified that Alfwear is a "premium brand"—comparable to a "Porsche" rather than a "Chevy"—and that its "customers are very loyal."[173] Alfwear's sole argument to the contrary, which cites a handful of cases from other circuits finding that consumers of athletic apparel do not select those products carefully, is unavailing given the record here.[174] Kevin Boyle's own testimony clarifies that Alfwear's clothing is not just athletic apparel, but rather "premium high performance clothing."[175] Therefore, "the evidence points but one way" under this factor and consequently favors KulKote.[176]

---

[170] *Webco Indus., Inc. v. Thermatool Corp.*, 278 F.3d 1120, 1128 (10th Cir. 2002).
[171] *M Welles & Assocs., Inc. v. Edwell, Inc.*, 69 F.4th 723, 735 (10th Cir. 2023) (cleaned up).
[172] *Heartsprings*, 143 F.3d at 557.
[173] Trial Tr. 153:7–15, 289:19–25, 291:13–19.
[174] Opp'n 42 n.20.
[175] Trial Tr. 75:4.
[176] *Mountain Dudes*, 946 F.3d at 1129 (internal quotation marks and citation omitted).

### F.      Strength or Weakness of the Mark

Under the final factor for likelihood of confusion, the court considers the strength of Alfwear's mark. "The stronger the mark, the greater the likelihood that encroachment on the mark will cause confusion."[177] Courts assess the strength of a mark in two ways: "conceptual strength, or the mark's place on the spectrum of distinctiveness; and commercial strength, or its level of recognition in the marketplace."[178] The five categories on the spectrum of distinctiveness, ranging from least to most distinctive, that courts use to measure conceptual strength are "generic, descriptive, suggestive, arbitrary, and fanciful."[179]

### 1.      Conceptual Strength

Conceptually, Alfwear's mark is suggestive, falling midway in the range of conceptual strength.[180] "Suggestive marks are considered inherently distinctive."[181] However, "[t]he greater the number of identical or more or less similar marks already in use on different kinds of goods, the less is the likelihood of confusion between any two specific uses of the weak mark."[182] In other words, courts consider how frequently a mark is used in the marketplace to determine conceptual strength.[183] Thus, the court must consider whether the evidence shows third-party use of the KÜHL mark that significantly saps its strength.[184]

---

[177] *Sally Beauty*, 304 F.3d at 975.
[178] *Kodiak Cakes LLC, v. Continental Mills, Inc.*, 358 F. Supp. 3d 1219, 1234 (D. Utah 2019) (quoting *Hornady*, 746 F.3d at 1007).
[179] *Elevate Fed. Credit Union*, 67 F.4th at 1074.
[180] *See Mast-Jaegermeister*, 2023 WL 5765891, at *14 (affirming district court's finding that the "KÜHL" mark is suggestive).
[181] *Elevate Fed. Credit Union*, 67 F.4th at 1074 (cleaned up).
[182] *Id.* (quoting *First Sav. Bank, F.S.B. v. First Bank Sys., Inc.*, 101 F.3d 645, 654 (10th Cir. 1996).
[183] *Id.* at 1074–75.
[184] Reply 18.

At trial, KulKote presented unrebutted testimony from Kevin Boyle that Alfwear is not the exclusive user of the KÜHL mark, that it was not the initial user of the mark (apparently, a manufacturer of egg-washing farm equipment was), and that other companies in the United States use the mark, though no information was provided as to those companies, how many there are, or what their products might be.[185] On this evidentiary record, the very limited evidence of third-party use is not extensive enough to undermine the KÜHL mark's strength.[186] Even a more robust showing would not have categorically prevented a finding of conceptual strength. Thus, a reasonable jury could conclude that KÜHL's suggestive mark was conceptually strong.

### 2. Commercial Strength

As for the KÜHL mark's commercial strength, the court assesses it "in the relevant market, which is where the alleged confusion would arise."[187] When analyzing the relevant market, the court considers the mark's "length and manner of use," its "nature and extent of advertising and promotion of the mark," and "the efforts made in the direction of promoting a conscious connection, in the public's mind, between the name or mark and a particular product or venture."[188]

At trial, Alfwear presented the following evidence regarding its commercial use of the KÜHL mark: Alfwear has used the mark since 1993; it has won numerous awards and celebrities have worn its products; it spent $25 million on marketing in 2025, upwards from $6 million in 2018 and $7.5 million in 2019; it generated $250 million in revenue in 2025, and $580 million

---

[185] Trial Tr. 70:2–9, 201:19–22, 201:23–24.
[186] Mot. 41–42; Opp'n 43–44.
[187] *Id.* at 1076.
[188] *Water Pik, Inc.*, 726 F.3d at 1154 (quoting *Donchez v. Coors Brewing Co.*, 392 F.3d 1211, 1218 (10th Cir. 2004)).

from 2013 to 2018; and it has sold tens of millions of products, all of which are labeled with the KÜHL mark.[189]

In the Tenth Circuit, however, this evidence alone does not indicate commercial strength. Marks "may lack commercial strength despite evidence that [the senior user's] products had millions of users and the use of well-known retailers to sell those products."[190] Instead, the evidence must demonstrate "whether the marks had stimulated the sales."[191] Faced with almost identical evidence of Alfwear's commercial use of the KÜHL mark, the Tenth Circuit held that "none of this evidence shows whether consumers consciously associate the KÜHL mark with Alfwear and its products."[192] And here, Alfwear again produced "no data on whether the average consumer was aware of the brand,"[193] nor has it conducted surveys to learn how many people are aware of the KÜHL mark.[194] Because "a jury could only guess whether [the KÜHL mark] enjoys substantial consumer recognition," the commercial-strength component favors KulKote.[195]

In sum, the conceptual strength of the KÜHL mark is suggestive, which slightly favors Alfwear and a likelihood of confusion. This is enough from which a jury could reasonably conclude that this factor favors Alfwear even with the insufficient showing on commercial strength.

---

[189] Trial Tr. 69:24–70:12, 157:17–158:2, 160:1–2, 254:15–255:7, 255:21–256:7.
[190] *Elevate Fed. Credit Union*, 67 F.4th at 1076 (internal quotations marks and citation omitted).
[191] *Id.*
[192] *Mast-Jaegermeister*, 2023 WL 5765891, at *15.
[193] *Water Pik*, 726 F.3d at 1155.
[194] Trial Tr. 265:7–9.
[195] *Water Pik*, 726 F.3d at 1155.

## II.   Willful Infringement

Defendants next argue that even if there were a legally sufficient basis for likelihood of confusion, no reasonable jury would have had a legally sufficient basis to find any infringement willful.[196] Plaintiffs contend that this argument is waived because Defendants did not raise it in their Rule 50(a) motion.[197] Granted, Defendants only argued intent in their Rule 50(a) motion under likelihood of confusion and did not specifically address willful infringement.[198] The word "willfulness" comes up only once—at the very end of their rebuttal—and is mentioned only in the context of disgorgement of profits.[199] However, Defendants made it clear they were challenging intent, which is the focus of willful infringement.

To establish willful trademark infringement, a movant must "show that the defendant intended to benefit from the goodwill or reputation of the trademark holder."[200] "Deliberate adoption of two similar marks can give rise to an inference that the defendant intended to benefit from the plaintiff's goodwill."[201] Alfwear cites *Wagner v. Live Nation Motor Sports, Inc.* to argue that a jury is "within its rights to believe little, or indeed, none of the sworn testimony favorable to [the defendant]."[202] Ultimately, however, the Tenth Circuit in *Wagner* reversed the denial of the JMOL and vacated the jury's verdict, holding that the plaintiff had failed to establish wanton conduct under state law.[203] The court reasoned that "[w]hile the jury was free to

---

[196] Mot. 46–48.

[197] Opp'n 50.

[198] Trial Tr. 565–72, 578–80.

[199] *Id.* 580:10–12.

[200] *W. Diversified Servs., Inc. v. Hyundai Motor Am., Inc.*, 427 F.3d 1269, 1274 (10th Cir. 2005).

[201] *Klein-Becker USA, LLC v. Englert*, 711 F.3d 1153, 1162 (10th Cir. 2013) (internal quotations and citation omitted).

[202] *Wagner v. Live Nation Motor Sports, Inc.*, 586 F.3d 1237 (10th Cir. 2009).

[203] *Id.* at 1248.

disregard or doubt the credibility of" witnesses who testified, "the jury was not free to infer [the defendant's] knowledge of danger from an *absence* of evidence on the issue."[204]

Here, there was not an absence of evidence. KulKote presented testimony about an innocuous selection of its mark, but "juries may choose to disbelieve testimony, including uncontroverted testimony."[205] And because a reasonable jury could find that the remaining evidence showed that Darren Gilmore had knowledge of the KÜHL mark and its marketing appeared to imitate KÜHL's in a variety of ways, the jury had a legally sufficient basis to infer KulKote's intent to benefit from the goodwill or reputation of Alfwear.

In sum, the court concludes that, after reviewing the evidence in the light most favorable to the jury's verdict, the jury could have found that all but one of the likelihood-of-confusion factors favor Alfwear. This is more than enough to provide the "quantum of evidence necessary to defeat a JMOL motion."[206] Likewise, the court declines to disturb the jury's verdict on willful infringement because it rests on a legally sufficient basis.

## ORDER

Accordingly, the court DENIES Defendants' motion for judgment as a matter of law under Rule 50(b).

---

[204] *Id.* at 1247–48.

[205] Opp'n 15 (citing *U.S. v. Johnson*, 495 F.2d 242, 244 (10th Cir. 1974) ("The case was submitted on Johnson's uncontradicted testimony . . . but, by its verdict, the jury obviously chose to disbelieve him, as it was entitled to do.").

[206] *Stroup*, 26 F.4th at 1156.

DATED May 8, 2026.

BY THE COURT:

David Barlow
United States District Judge